IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal Action No. 3:11cr35-JAG

ELIUD DELGADO SANTIAGO,

and

DAVY FORTEZA ROMAN,
                          Defendants.

### <u>MEMORANDUM OPINION</u>

The defendants in this case have moved to suppress evidence seized from their rental car. This case is another in a series of incidents in which police officers stop drivers, ostensibly for routine traffic offenses, and drag out the stop until they have probable cause to search the drivers' vehicles. *See United States v. Powell*, No. 08-4696, 2011 U.S. App. LEXIS 22795 (4th Cir. Nov. 14, 2011); *United States v. Guijon-Ortiz*, 660 F.3d 757 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011); *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011); *see also United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011). *But see United States v. Curry*, No. 11-4253, 2012 U.S. App. LEXIS 8071 (4th Cir. April 19, 2012); *United States v. Davis*, 460 Fed. Appx. 226 (4th Cir. 2011); *United States v. Green*, No. 7:11cr57, 2011 U.S. Dist. LEXIS 146916 (W.D. Va. Dec. 21, 2011). Here, the officer measurably lengthened the stop and expanded the scope of his investigation without reasonable suspicion, thereby violating the defendants' Fourth Amendment rights. For that reason, the Court will suppress the evidence.

The defendants, Eliud Delgado Santiago and Davy Forteza Roman, were indicted on one count of possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). (*See* Dk. No. 27.) They moved to suppress the physical evidence on constitutional grounds. The Court initially denied their motions and the defendants pleaded guilty to the charges pursuant to a conditional plea agreement. (*See* Dk. Nos. 39, 40, 43, 44.)

In light of the Fourth Circuit's recent decision in *United States v. Digiovanni*, however, the Court granted the defendants leave to re-brief the issues addressed in their motions to suppress. 650 F.3d 498 (4th Cir. 2011). Because the police officer intrusively expanded the scope of his investigation and prolonged the stop beyond the time reasonably required to complete its mission, the Court will grant the defendants' motions to suppress.

## I. Facts

In January, 2011, Senior Trooper Steven Homiak of the Virginia State Police worked on an "interdiction" team on Interstate I-95. The interdiction team did not make routine traffic stops. Rather, it targeted travellers who the officers believed were engaged in unlawful activities. Trooper Homiak testified that "we do not answer calls for service, wrecks, or broken down cars and things of that nature." (Tr. 6, ln. 1-3.) Instead, the state police assigned him and his colleagues to a different duty: "to interdict criminals traveling from point A to point B." (*Id.*, ln. 4.)

On January 14, 2011, at approximately 2:30 p.m., Trooper Homiak, hidden in a crossover, observed a white Dodge minivan travelling north on I-95 at a "high rate of speed" in Greensville County, Virginia. Homiak pulled out behind the vehicle and followed it for almost two miles. At one point, he observed it drive onto the shoulder as it switched from the left to

2

right lane. From the right lane, Homiak accelerated until he was beside the van and paced its speed at 82 miles per hour, 12 mph over the posted limit.[1] He testified that he paced the vehicle for a distance of one to two tenths of a mile, or between 175 and 350 yards.

Homiak also pulled up next to the van to identify the people in the vehicle. After identifying two Hispanic males, Homiak then decelerated to a position behind the minivan and turned on his patrol car's blue lights, which automatically activated audio and video recording equipment, capturing the traffic stop on tape. The van immediately pulled over to the shoulder of the road. At the same time, another member of the interdiction team had stopped a different car about a mile away. The second car also contained "Spanish" men.

Trooper Homiak left his patrol car and approached the passenger side of the van to ask the driver for his license and registration. He instantly recognized a language barrier between himself and the two Spanish-speaking, Puerto Rican men. The passenger could understand a minimal amount of English; the driver none. Nonetheless, Trooper Homiak began to question the defendants, initially asking, "Whose car is this?" Santiago, the passenger, replied that they had rented the minivan in Orlando, and handed Homiak the vehicle rental agreement. The agreement also showed that the van had been rented on January 13, at 6:04 p.m., that Santiago was the renter, and that Roman was an authorized driver along with Santiago. Although the car had been rented in Florida, the agreement said that it would be returned in Philadelphia. Santiago and Roman also provided Homiak with valid Puerto Rican driver's licenses.

Approximately one minute and forty-five seconds into the traffic stop, Homiak told the defendants that they had been traveling eighty-two miles per hour or "ochenta y dos," and that

---

[1] Other than his speedometer, the officer did not use any electronic or mechanical device to test the speed of the vehicle.

the speed limit was seventy. During this exchange, Roman seemed to tell the officer that he had set the van's cruise control to seventy mph.

Next, Trooper Homiak asked a series of questions concerning the defendants' travel plans: How long had the defendants been in the United States? When did they leave Puerto Rico? Did they fly from Puerto Rico to Florida? What day did they fly? Some of the defendants' answers were unintelligible on the recording; others, like the day of their flight to Florida (Sunday) were informative.[2] Trooper Homiak then told Santiago to get out of the car to meet with him. While talking with the defendants, the officer had noticed several bags of fast food wrappers, one big piece of luggage, and a new GPS box on the floor of the minivan. Homiak viewed the fast food, luggage, and GPS box as suspicious.

Standing on the side of the interstate, Trooper Homiak posed several questions to Santiago about the rental agreement, finally instructing him to sit in the front passenger seat of his patrol car. He left Roman in the van and proceeded to join Santiago in the car. For nearly two and a half minutes thereafter, Homiak continued his inquiry into the defendants' travel plans. He asked where they were going (answer: Philadelphia), the purpose of their trip (answer: to visit Santiago's uncle and Roman's brother), how many days they were staying (answer: two), why they did not fly (Santiago did not understand), and where they had rented the van (answer: Orlando).

While questioning Santiago, Homiak was also texting Trooper Christopher Murphy to join them. Murphy had a drug-sniffing dog. Around six minutes and twenty seconds into the

---

[2] The Court finds the following to be an accurate account of the defendants' travel itinerary: On Sunday, January 9, 2011, the defendants flew from Puerto Rico to Orlando. On Thursday, January 13, they rented the minivan for four days, to be returned on Sunday, January 16th in Philadelphia, PA. On January 14, the defendants were stopped by Trooper Homiak while driving on I-95 from Orlando to Philadelphia.

stop, Trooper Homiak got out of his car, leaving Santiago inside, and again approached the passenger side of the minivan. He testified that he had received Santiago's valid Puerto Rican driver's license; however, he was unfamiliar with Roman's license. (Tr. 16, ln. 15-24.) Homiak's intention was ostensibly to see if Roman had another type of license. (*Id.*)

Despite the driver's limited ability to communicate, Trooper Homiak questioned him extensively about their travel schedule using a mixture of broken English and Spanish. Roman inquired at one point if he was getting a ticket. The officer replied, "No. No ticket."[3] Roman then reached his hand out to shake the officer's, but Homiak declined. According to Trooper Homiak, Roman was shaking as he held out his hand.[4] Homiak also testified that Roman's hand was clammy; he later admitted, however, that he never touched Roman's hand. (Tr. 59, ln. 23-24.) Although Homiak took the nervousness as a suspicious sign, he admitted many motorists are nervous when stopped by the police.

Approximately eight minutes into the stop, Homiak returned to his patrol car. He was joined by Trooper Murphy and Murphy's drug-detecting canine, Buro. Homiak told Murphy

---

[3] On this issue, Trooper Homiak testified:

> When I went back up the second time to talk to the driver, he again displayed the same levels of nervousness. The reason I told him I wasn't going to write him a ticket is a lot of people we stop out there and say, hey, we are going to write you a ticket, or they just think because they are getting stopped they are automatically getting a ticket and being nervous. So I told him that to see if he would calm down. And actually when I told him I wasn't going to write him a ticket he stuck his hand out to shake my hand, and his hands was [sic] very sweaty. And it was shake—almost had to grab it with both hands. But it was shaking very uncontrollable. That is why I wasn't going to write him a ticket at that time.

(Tr. 19-20, ln. 22-25, 1-12.)

[4] Homiak testified that both defendants exhibited signs of extreme nervousness at times, including unusual sweating and shaking. He said that Roman displayed these signs from the outset of the stop. Santiago, on the other hand, was calm and relaxed, except when the drug dog appeared. At that point, Homiak observed Santiago's carotid artery pulsating and unusual sweating, among other signs of nervousness.

that there was some discrepancy in the defendants' stories—he claimed Santiago told him they were staying in Philadelphia for two days, and Roman said one.   Based on his suspicions, Homiak asked Murphy to run the dog around the van while he returned to his patrol car.   Once inside, Trooper Homiak assured Santiago that he needed to fill out some paperwork before he let them go.   Around eleven minutes and fifty seconds into the stop, on Buro's third lap around the van, the dog alerted to the vehicle's back bumper by twitching its head.[5]   Murphy apparently told Homiak about the alert (the taped audio is unclear), and Homiak said, "Let me check it and make sure."   Homiak then asked Santiago if there were any drugs, guns, or money in the van; he answered "no."   Murphy then removed Roman from the vehicle and gave him a pat-down search. While Murphy checked the back-seat area of the van near the sliding side door, Trooper Homiak began searching the trunk.

Approximately fourteen minutes and twenty seconds into the traffic stop, Homiak can be heard telling Murphy, "That guy in my car [Santiago] is flipping out."   Less than ten seconds later, Murphy discovered a shipment of cocaine in the stow-and-go compartments behind the front seats of the rental van.[6]   Only after the defendants' arrest did Trooper Homiak finally run their licenses and confirm that they were valid.

## II. **Discussion**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const.

---

[5] On the video recording of the stop, the "alert" is difficult to identify.   What, if anything, in the dog's behavior constitutes an alert is unclear.   Nevertheless, the officers' testimony is unrebutted that the dog did something indicating that he smelled drugs in the van.
[6] The stow-and-go compartments were manufacturer-installed, not after-market special additions to the vehicle.

amend. IV.   As such, "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles").   The Constitution, therefore, permits an officer to make an investigative detention or stop only if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011) (citing *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *see United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) ("Since *Terry v. Ohio*, 392 U.S. 1 (1968), a 'reasonable suspicion' of criminal activity has justified an officer's brief stop or detention of the suspect sufficient to permit the officer to allay the suspicion.").   "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *see Foster*, 634 F.3d at 246.

The Fourth Circuit has recognized that this standard "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life." *Mason*, 628 F.3d at 128 (citing *United States v. Foreman*, 369 F.3d 776 (4th Cir. 2004)).   Accordingly, the Court must consider the totality of circumstances in this case, and determine whether the police had an

objective, particularized basis sufficient to raise suspicion of suspecting criminal activity. *Arvizu*, 534 U.S. at 273; *Massenburg*, 654 F.3d at 482.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Because a traffic stop is more analogous to an investigative detention than a custodial arrest, the Court must treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).

Under *Terry's* "dual inquiry," after asking whether the officer's action was "justified at its inception." *Rusher*, 966 F.2d at 875, the Court asks whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Guijon-Ortiz*, 660 F.3d at 764. In other words, the second prong requires the Court to analyze whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Digiovanni*, 650 F.3d at 506; *Rusher*, 966 F.2d at 875. At the same time, the Court must determine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *Digiovanni*, 650 F.3d at 507. *See also Royer*, 460 U.S. at 500 (noting that the scope of a seizure "must be carefully tailored to its underlying justification," and that the government bears the burden to "demonstrate that the seizure it seeks to justify . . . was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"). "While such a detention does not require probable cause, it does require something more than an

'inchoate and unparticularized suspicion or hunch.'" *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *Terry*, 392 U.S. at 27); *see Foster*, 634 F.3d at 246.

With respect to *Terry's* first prong, the Court finds that the traffic stop was justified at its inception.  Trooper Homiak testified that the van was speeding and swerved onto the shoulder—both violations of Virginia law.  Any subjective ulterior motive a police officer may have for making the traffic stop is irrelevant.[7]  *Whren* at 813; *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively).  The first prong is satisfied because the initial stop was justified by the unrebutted evidence of a traffic violation.  *See United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (noting that a traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop").

The heart of this case, however, concerns the second prong of the *Terry* test—that the seizure must be sufficiently limited in scope and duration.  With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500; *Guijon-Ortiz*, 660 F.3d at 764.  In terms of duration, the reasonable time for a traffic stop "cannot be stated with mathematical precision," *Branch*, 537 F.3d at 336, but a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess

---

[7] The Court notes that Homiak pulled up next to the van and checked who was inside before making the stop, and that his colleagues on the interdiction team simultaneously stopped a second car containing "Spanish" people.  Whatever his intent, however, it plays no role in the Court's decision.

9

reasonable suspicion or receive the driver's consent." *Digiovanni*, 650 F.3d at 507 (citing *Branch*, 537 F.3d at 336).

Importantly, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. *Id.* (citing *Foreman*, 369 F.3d at 781). All of the officer's questions or actions, however, "need not be solely and exclusively focused on the purpose of that detention. *Mason*, 628 F.3d at 131. Instead, he or she may "inquir[e] into matters unrelated to the justification for the traffic stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle's exterior, *Caballes*, 543 U.S. at 409, but again only "so long as those inquires [or other actions] do not measurably extend the duration of the stop." *Guijon-Ortiz*, 660 F.3d at 765 (citing *Johnson*, 129 S. Ct. at 788). This approach has been adopted in the Fourth, Sixth, Eighth, and Ninth Circuits. *See Guijon-Ortiz*, 660 F.3d at 767; *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010); *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008) (holding that "whether questioning unrelated to the purpose of the traffic stop and separate from the ticket-writing process that prolongs the duration of the stop may nonetheless be reasonable" is determined by "examin[ing] the 'totality of the circumstances' surrounding the stop"); *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) (("Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine.") (citing *Sharpe*, 470 U.S. at 685-87)).

In *Digiovanni*, the Fourth Circuit relied strongly on *Everett*, which addressed an artificially lengthened traffic stop. The Fourth Circuit recognized "two types of prolongation cases, one where the traffic stop has concluded, in which any subsequent detention is impermissible without the presence of reasonable suspicion, and those in which there is some prolongation before the stop is completed because the police officer is pursuing parallel investigative purposes, one related to the justification for the traffic stop, the other unrelated." *Digiovanni*, 650 F.3d at 508 (citing *Everett*, 601 F.3d at 492 n.9). While not all prolongation because of unrelated questioning violates the Fourth Amendment, the lengthening of a stop becomes unconstitutionally excessive when the "'totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was [un]reasonable.'" *Id.* at 508 (quoting *Everett*, 601 F.3d at 494) (internal quotation marks omitted).

The reasonableness of a stop depends on the police officer's "diligence in accomplishing the purposes of stop, that is, investigating whether a traffic infraction occurred and issuing a ticket." *Id.* When the officer abandons the purpose of the traffic stop and "embark[s] on another sustained course of investigation" or where the questions unrelated to the stop make up the bulk of the officer's exchange with the defendant, the prolongation is unconstitutional. *Id.* at *508* (quoting *Everett*, 601 F.3d at 495).

Turning to the traffic stop in this case, the Court finds that Trooper Homiak pursued his mission as a member of the interdiction team. It is not surprising, then, that he failed to diligently pursue the purposes of the stop and embarked on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter between the officer and defendants. *See Digiovanni*, 650 F.3d at 509. At the outset, Homiak stayed with the

11

approved script for a routine traffic stop, asking for a license and registration, then inquiring who owned the car before receiving the rental agreement.  See *Branch*, 537 F.3d at 337; *Foreman*, 369 F.3d at 781.  He then informed the defendants of the reason for the encounter—their 82 mph speed.  Just over two minutes into the stop, however, Trooper Homiak embarked on a sustained investigation of the defendants' travel history, plans, and purpose.

The officer's subsequent actions "bespeak an utter lack of diligence." *Digiovanni*, 650 F.3d at 510.  Homiak's questions concerning the defendants' flight from Puerto Rico, where they were going, how long they were staying, and their purpose for the trip were unrelated to the reason for the traffic stop.  This line of questioning continued with Santiago in his patrol car, where Homiak claimed to have been diligently completing the necessary paperwork.[8]  In fact, this unrelated questioning spanned a period of nearly six minutes.  By separating the defendants, too, Trooper Homiak doubled the amount of time and questions he asked (since they were basically the same for both), and opened the door to a misunderstanding regarding their travel plans.  *Id.* at 509 (noting that the delay caused by the unrelated questioning must be de minimus).  From the outset, Homiak was acutely aware that he could not rely on any communication with Roman, given the language barrier; yet, the officer relied on his answers to further his suspicions of criminal activity.  Finally, after informing the defendants that no ticket would be issued and only paperwork needed to be completed before they could go, the drug-sniffing dog alerted to the back of the van.  This was approximately twelve minutes into the traffic stop.

The government submits that Trooper Homiak diligently pursued the purpose of the traffic stop, but was delayed by the computer's inability to verify Roman's identification.  This account, however, is contradicted by Homiak's testimony:

---

[8] The "necessary" paperwork consisted primarily of filling out a report on why he made an interdiction stop.  Homiak did not issue a citation or even a warning.

Q: When you—did you ever verify that their licenses and registration and rental papers were all valid?

A: When I tried to run the driver's license on the computer it didn't come back with anything. It was still searching. You have to do a special way when you do it on a computer in order to do that, get that information back.

Q: When did you put, input that?

A: After the arrest.

Q: After the drugs were found?

A: Yes, sir.

Q: So there was never an attempt to verify or to make certain that their legitimate, their paper work was legitimate before you did the interdiction investigation?

A: As soon as the dog alerted, Trooper Murphy told me the dog alerted, I wasn't concerned about the ticket any more. We were concerned about searching the car. That was put on the back.

(Tr. 63-64, ln. 10-25, 1-4.)

Even if one were to accept the government's contention that Homiak was filling out necessary paperwork while waiting for verification on Roman (which the Court finds to be untrue), the officer's purpose was clearly to conduct a criminal investigation of two Puerto Rican men he pegged as drug dealers. Homiak spent much of the stop's first eight minutes grilling the defendants on their travel itinerary while filling out a form with the "indicators" of criminal activity that made him suspicious of the defendants. At the point Homiak began filling out this "Form B," his only possible indicators of criminal activity were the minimal nervousness from Roman, their travel on I-95 from Florida, and his mistaken perception that they were on a quick turnaround trip. "[A]n objective assessment of an officer's actions in light of the facts and circumstances then known to him," simply cannot support the government's insistence, after-the-

13

fact, that Trooper Homiak had a reasonable basis for suspicion of criminal activity. See *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010).

The government offers a number of facts allegedly giving Homiak a reasonable suspicion that wrongdoing was afoot. In a trio of recent cases, however, the Fourth Circuit has stressed its significant concerns with the government's proffering "whatever facts are present, no matter how innocent, as indicia of suspicious activity." *See Powell*, 2011 U.S. App. LEXIS 22795, at *2; *Massenburg*, 654 F.3d at 482; *Digiovanni*, 650 F.3d at 512. The court has been "deeply troubled by the way in which the Government attempts to spin . . . mundane acts into a web of deception." *Foster*, 634 F.3d at 248. Here, Trooper Homiak proffered several reasons or "indicators" for his suspicions of criminal activity and, therefore, his decision to call the drug dog and extend the traffic stop beyond the routine: (1) there were bags of fast food and drink cups in the van; (2) the van contained a new GPS device; (3) the officer noticed one piece of luggage for two people; (4) the defendants were traveling on I-95 from Florida to the northeast, a well-known drug route; (5) the officer believed that the defendants were making an unusually short turnaround trip; (6) the defendants offered "conflicting stories" with regard to their travel itinerary; and (7) the signs of nervousness, including heavy breathing, sweating, shaking, "big eyes," and a pulsating carotid artery.

Ultimately, the Court finds that reasonable suspicion was not present to turn this routine traffic stop into a drug investigation.

First, the articulated facts, in their totality, simply do not eliminate a substantial portion of innocent travelers. *See Digiovanni*, 650 F.3d at 513 (citing *United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000) (*en banc*)). Instead, they represent a futile attempt to spin ordinary

14

details of life into a web of deception and suspicious activity.[9]  For instance, the officer's reliance on fast food bags to show an unwillingness to stop and, therefore, the potential for criminal activity is baseless.  Fast-food eateries proliferate along our nation's interstate highways because many travelers driving several hundred miles want to eat quickly and get on with their trips.  Rather than litter the highways, many motorists keep the trash from their hasty meals in their cars.  Moreover, given that most of the defendants' drive occurred late at night, fast-food joints were likely the only places open to them.  The food wrappers mean nothing.

Similarly, the officer's reliance on the existence of a portable GPS device was unjustified.  According to Homiak, most rental vehicles come equipped with a GPS that can enable law enforcement to track the vehicle.  Yet, in this case, the minivan's lack of a factory-stalled GPS system was obvious—the portable one was the defendants' only mode of electronic navigation.  Thus, the officer's reasoning behind the "suspicious" new GPS falls flat.  The new

---

[9] In *Foster*, the Fourth Circuit expanded on this concern, stating:

> Although these matters generally only come before this Court where a police seizure uncovers some wrongdoing, we would be remiss if we did not acknowledge that the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone—whether he or she is one of the most affluent or most vulnerable members of our community. *See Terry*, 392 U.S. at 12-13 ("Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."). We appreciate that police are often called upon to make very difficult decisions about when to conduct Terry stops, and, for that reason, we give them leeway to make these determinations.  Nonetheless, the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 565, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976) (noting that a purpose of the Fourth Amendment is to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure").

*Foster*, 634 F.3d at 248-249.

GPS simply is a device that two men, far from home and uncomfortable with English, can rely on for directions.

The single piece of luggage gets the government no further. The presence of a single bag may be curious, but provides no evidence of criminal activity.

Additionally, the fact that the defendants travelled on I-95 from Florida to Philadelphia does not indicate criminal activity. While some people undoubtedly use I-95 for unlawful purposes, literally millions of cars drive on the road each year. Interstate highways were created to allow Americans to get to places quickly. President Eisenhower considered them one of the most important achievements of his eight-year presidency. The government itself touts the interstate system as the "Greatest Public Works Project in History." History of the Interstate Highway System, http://www.fhwa.dot.gov/interstate/history.htm (last visited June 12, 2012) (capitalization in original). No one should be surprised that people driving north from Florida use I-95.

With respect to the defendants' signs of nervousness, such indicators can enter the reasonable suspicion calculus. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Homiak admitted, however, that drivers are often nervous when stopped by the police. Anyone who has ever received a traffic summons can testify to the unpleasantness of the experience. *See United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998); *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer"); *United States v. Millan-Diaz*, 975 F.2d 720 (10th Cir. 1992).

16

Moreover, the Court does not find Homiak's testimony about nervousness to be credible. The video evidence tempers his testimony. Neither defendant exhibited the signs of extreme nervousness proffered by Homiak. Their voices were not shaky. They answered the officer's questions quickly, truthfully, and with as much clarity as possible considering the language barrier. Indeed, Roman appeared upbeat as he exited the minivan and received a pat-down from Trooper Murphy. Homiak further admitted that Santiago was calm and composed until the drug dog arrived—after Trooper Homiak had begun the drug investigation. Trooper Murphy, on the other hand, noticed no signs of sweating, heavy breathing, or trembling. (Tr. 121, ln. 22-24.; Tr. 125, ln. 7-15.)

Homiak's testimony about Santiago's sweaty palms casts additional doubt on his recollection of nervousness. Homiak said that the driver had sweaty palms, showing some nervousness. Yet, he flatly testified that he did not shake his hand. This casts doubt on whether he could have observed how sweaty, if at all, the palms actually were.

In short, the Court does not accept the officer's testimony about nervousness. Even if the Court did accept that the defendants were somewhat nervous, the video and the officers' testimony show that it amounted to little more than a natural reaction to a traffic stop.

In regard to the evidence of a short turnaround trip and conflicting travel schedule, the officer was not justified in his reliance. It is clear that Homiak and the defendants faced a language barrier that impeded reliable communication. The one reliable source of information in plain English was the van rental agreement, which Homiak received at the beginning of his contact with the defendants. The agreement explicitly stated that the vehicle was to be returned in Philadelphia, not Orlando, so there was no evidence of a quick return trip in the van. And, nowhere in the record, including the video of the stop and Trooper Homiak's testimony, could a

17

reasonable, objective person conclude that the defendants were driving back to Florida before their rental period expired. On this issue, Homiak testified:

> Q: We agree that the quick turn around trip is now not relevant.
>
> A: Absolutely it is relevant. One of the biggest indicators I saw.
>
> Q: Right. Even though the document [rental agreement] says that they are going to Philadelphia?
>
> A: The document can say what it wants to, but when I asked the people where they were going or coming from, I rely on their response to where I make my decision whether to search or call for a dog or kick them loose.
>
> Q: Were one of these men at any point saying to you they were going going [sic] back to Orlando?
>
> A: I don't remember if they said they were or not, to be honest with you.
>
> Q: There is no appearance of that in your report is there? No reference whatsoever they were returning to Orlando?
>
> A: I don't recall if they said they were going back. I just remember how long they said they were going to Philadelphia.
>
> Q: You used that as an indicator?
>
> A: Which is?
>
> Q: Quick turn around trip.
>
> A: Right. They said they were going to be there for one day, which means they were going to leave after being there for one day.

(Tr. 76-77; ln. 21-25, 1-23.) Clearly, Trooper Homiak either misinterpreted his conversation with the defendants or manipulated his understanding to further his suspicions of drug activity. The latter is supported by his separate questioning of Roman in which Homiak offers various options for their length of stay ("Two, three, four days?"). With Roman undoubtedly confused by his questions, Homiak settled on asking if they were returning "tomorrow," and Roman replied in the affirmative. At that point, the officer was well aware of the driver's inability to

understand English; yet, he explicitly relied on the defendants' "conflicting stories" to turn the traffic stop into a drug investigation. This was an unreasonable conclusion given the evidence and situation before the officer. Furthermore, it is uncontroverted that Homiak requested Trooper Murphy to provide backup with his drug dog *before* Homiak questioned Roman separately.

Viewed collectively, the evidence does not raise a reasonable suspicion of criminal activity. There are an infinite number of reasonable explanations, unrelated to any criminal behavior, to explain why travelers would eat fast food, use a portable GPS, carry one suitcase, travel on I-95, and get nervous when stopped by the police. *See Foster*, 634 F.3d at 247. These are the types of post-hoc rationalizations that are impermissible as justifications for reasonable suspicion.

### III. Conclusion

In sum, the prolonged detention and search of the defendants in this case was not supported by articulable facts sufficient to provide reasonable suspicion. Under the totality of the circumstances, then, Trooper Homiak violated the defendants' Fourth Amendment rights by unreasonably delaying their detention to question them about unrelated matters. The delay caused by this questioning was not de minimus.

Accordingly, the Court will grant the defendants' motions for reconsideration and, in effect, their motions to suppress. The evidence seized during the traffic stop may not be admitted during trial. The defendants are granted leave to withdraw their guilty pleas.

An appropriate order shall issue.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

19

Case 3:11-cr-00035-JAG   Document 61   Filed 06/19/12   Page 20 of 20 PageID# 481

Date: June 19, 2012
Richmond, VA

/s/

John A. Gibney, Jr.
United States District Judge